GILES, by guardian *ad litem,* Respondent, vs. HODGE and others, Appellants.

*September 6 — September 24, 1889.*

*(1) Mental incapacity: Undue influence: Conveyance of lands: Evidence. (2) Record of subsequent adjudication of incapacity. (3) Subsequent declarations.*

1. In an action to set aside conveyances of land made by the plaintiff to two of his daughters, the evidence showed, among other things, that at the time of executing the deeds the grantor was over sev-

enty-five years old; that his mind had been gradually failing for several years; that he had scarcely any memory of even important events in his life, and scarcely any knowledge or recollection of his business transactions or the condition of his affairs; and that a short time before, when a third daughter came home after an absence of three or four years, he did not know her. It appeared further that the husbands of the grantees induced the grantor to execute the conveyances by representing to him that a third son-in-law was about to have a guardian appointed over him; and that the grantees and their husbands then assumed a *quasi* guardianship over him; that the lands were worth $5,000, and the actual consideration was only $10 and a vague oral promise to support the grantor; and that, upon an application made by the third son-in-law on the day after the conveyances, the grantor was adjudged to be mentally incompetent. *Held,* that the evidence supported the findings of the trial court that the grantor was mentally incompetent when the conveyances were executed, and that they were procured through fraud and undue influence.

2. To show mental incapacity at a certain time, the record of a subsequent adjudication of incapacity is admissible in connection with evidence that there had been no change in the conditions between the time in question and such adjudication.

3. The alleged incapacity of a person to execute deeds being the result of old age and a gradual failing of his mental powers, his declarations made upon an inquisition *de lunatico* within ten months after the deeds were executed, are *held* competent to show his condition at the time of such execution.

APPEAL from the Superior Court of *Milwaukee* County. The case is stated in the opinion. The defendants appeal from a judgment in favor of the plaintiff.

For the appellants there was a brief by *Turner & Timlin,* and oral argument by *W. J. Turner.*

*C. E. Monroe,* for the respondent.

ORTON, J. This action was brought by *John Giles,* by his guardian, to set aside, cancel, and annul two certain deeds, one executed by the said Giles to his daughter *Nelly Hodge* on the 6th day of June, 1887, of lot 7, in block 13, in the First (but now the Eighteenth) ward of the city of Mil-

waukee, and the other executed by the same grantor to his daughter *Mary Richards*, on the same day, of lot 8, in the same block and ward, on the ground that said deeds were procured by fraud and undue influence from the said *Giles*, he then being incompetent from great mental weakness and incapacity.

The main facts are as follows: *John Giles* came to Milwaukee about fifty years ago, and has resided there ever since, and at the time of the trial was between seventy-five and eighty years of age. He was twice married, and by his first wife had three children, who are now living and are the two defendants *Nellie* and *Mary*, and Annie Donaldson, whose whereabouts is unknown; and by his second wife, Frances, the wife of one Horace Buell. His last wife died in 1881. Up to that time he had been an ordinarily good business man for one of his age, prudent in the care of his property and close in his bargains, and did a profitable business, and kept himself free from debt, and had $500 in the bank, and frequently expressed a determination to keep all of his property and to dispose of none of it during his life. His disposition and manners were pleasant and agreeable, and he was kind to his family. On the death of his last wife, in 1881, a great change took place in him and his affairs. He sold his personal property with which he had done business, and ceased doing any kind of business. He became morose and cross towards his daughter Frances, and his step-daughter, Mrs. Nagle, who remained with him for a short time. He was offered a home with his children, but preferred to live in his old house alone. He was negligent in the care of his property and of his person. The buildings upon his lots came to be in great want of repair, and his property generally needed improvement, and he paid no attention to it. He was easily imposed upon by those having designs against his money or property. He became involved in debt, and was com-

pelled to sell to his son-in-law, the defendant *Hugh Hodge*, one of his lots for $455 he had borrowed of him, and for about $745 in cash, which mostly went to pay his debts, and he was afterwards compelled to borrow other sums of money of said *Hodge*, and finally owed him about $370. He suffered for the want of food and clothing, unless furnished by others.

This was his condition as to his property and person on the 6th day of June, 1887, when the said deeds were executed. The two lots at that date were worth $5,000, and improving in value. A short time before that, his daughter Mrs. Buell came home to see her father after three or four years' absence, and he did not know her. She told him that she had come home to take care of him. He said he did not need any care, and he did not want anybody there. Both his house and person were greatly in need of care and cleanliness. On the question of his mental condition and capacity at that time it is needless to make any further special reference to the testimony, and I need only to say of it that we are satisfied that it fully warranted the finding of the superior court that " upon said day [the 6th day of June, 1887,] he [*Giles*] was, and ever since has been, of unsound mind, and by reason of extreme old age and the impairment of his faculties thereby occasioned he was, and ever since has been, mentally incompetent to have the charge of his property or to transact business, and incapable of taking care of himself, and that he had been approaching this condition of mental incompetency for some years prior to said date. It is very clear from the evidence that *Giles* had scarcely any memory of even important events of his life,— such as, when he came to Milwaukee, and when his last wife died, and of what she died; and had scarcely any knowledge or recollection of his business transactions or the condition of his affairs.

On the 5th day of June, 1887, the said Buell, after ascer-

taining the condition of his father-in-law, *Giles*, and of his affairs, and by the concurrence of his wife, determined upon taking the necessary measures to have a guardian of his person and property appointed by the county court. He thereupon called upon his brother-in-law, the said defendant *Richards*, and consulted him as to the advisability of applying for such appointment. *Richards* declined having anything to do with it one way or another, but on the same day made the fact known to his wife and the other defendants, that Buell contemplated making such an application. The next morning the said *Hodge* and *Richards*, with the knowledge and approval of their wives, went to the house of *Giles*, in a distant part of the city, and informed him that Buell intended to have a guardian appointed over him, and they advised and thereby induced him to have said deeds executed at once, and they took *Giles* to their own homes, and, after said deeds were so executed, imposed upon him the condition that he must thereafter and always spend his nights at one of their homes, and they assumed a *quasi* guardianship over him, and so he has remained. The deed to said *Mary Richards* contains a nominal consideration of $1,000, and the deed to *Nelly Hodge*, that of $1,500; but the actual consideration of each one was only $5. The deeds were recorded on the 7th day of June, 1887. There was a vague oral promise on the part of said defendants that they would support *Giles* during his life, but they were not bound by any formal agreement to do so; and the two grantees had no other property than that conveyed.

These are the facts in respect to the inducements and undue influence, and they fully support the finding of the superior court that " *Giles* did not know the value of the property thereby conveyed to said defendants *Nelly* and *Mary*, and did not comprehend, and was not mentally capable of comprehending, the character of the transaction; that the defendants knew of his mental incompetency

and his dependent condition, and that he did not treat with them on equal terms; that the consideration for said deeds was wholly inadequate, and the arrangement entered into by said *Giles* an improvident and inequitable one; and that a presumption of fraud and undue influence arises from the circumstances attending the transaction, which has not been met by the defendants; and that said deeds were procured from said *Giles* by fraud and undue influence on the part of the defendants."

This treatment, control, and assumed guardianship of *Giles* constitute a very strong admission and confession on the part of the defendants, both of his mental weakness and incapacity, and their undue influence over him. The presumptions arising from the transaction itself supply much evidence and require much to overcome them. There is considerable testimony tending to prove the main facts charged, besides the records of the county court and the circuit court of the inquisition under a writ *de lunatico inquirendo*, and the evidence on which they were founded, establishing the incapacity and incompetency of *Giles* at or about that time, and upon which the principal objections and exceptions of the appellants were raised, which, together with the above admissions and confessions, would seem to be quite sufficient to warrant the findings of the court.

Exceptions to the admission of evidence in an equity case are only material when the evidence objected to is essential to establish the material allegations of the complaint, and then they are not grounds of error, as in a case at law, but the suit fails for want of competent proof. The records and evidence above referred to, which were received against the objections of the appellants, were as follows: As the said Buell had communicated to the defendants on the 5th day of June, 1887, his determination to do, on the 7th day following he filed in the county court his petition to

have the said *Giles* declared incompetent to attend to his business or to take care of his property, and to have a guardian of his person and estate appointed. The matter came to a hearing on the 8th day of September following, and the said *Giles* and other witnesses were examined, and on the 3d day of December thereafter the county court adjudged the said *Giles* to be mentally incompetent, and appointed a guardian. An appeal was taken to the circuit court, and that court, after a full hearing on the 29th day of March, 1888, on the 28th day of April following found that, on said 7th day of June, 1887, the said *Giles* was and has continued to be mentally incompetent to have the charge and management of his property, and incapable of taking care of himself, and affirmed the order of the county court appointing a guardian.

The learned counsel of the appellants concede that these records were proper evidence as to the mental condition of *Giles* at the time the guardian was so appointed. It has been so decided by this court. *Burnham v. Mitchell*, 34 Wis. 117. See, also, 2 Bish. Mar. & Div. § 567; *Van Deusen v. Sweet*, 51 N. Y. 378. But they contend that such records can have no such effect at any time anterior to the adjudication. In this case the petition was filed the next day after the deeds were executed. In *Burnham v. Mitchell, supra*, the record was offered to prove the mental incapacity of Foster, *reaching back many years* before the application was made. The adjudication here was of the time when the petition was filed, and the circuit court found that *Giles* was incompetent on that day and continued to be so. It is no doubt the general principle that the adjudication cannot relate back to a prior time as evidence of incapacity, and so, too, as to the future also, except by the *presumption* that it continued. *Semel furibundus semper furibundus præsumetur*. But when it is shown that the mental incapacity and condition had been the same for a

considerable time, and was the same at the date of the act to be affected by it as when adjudication was had, the adjudication is none the less competent. This was held in *Terry v. Buffington*, 11 Ga. 342, cited by the counsel of appellants. In a case where the mental weakness and incapacity are the concomitants of old age, and have been gradual and continuous for a considerable time, and not the result of any recent or intervening cause, but of gradual and natural decay, such evidence is competent to show that the conditions had not changed, but were the same as when the adjudication was had; and the adjudication itself is admissible as the foundation of such an inquiry. *Dailey v. Kastell*, 56 Wis. 444; *Smith v. Smith*, 60 Wis. 329; *Ashcraft v. De Armond*, 44 Iowa, 229; *Robinson v. Hutchinson*, 26 Vt. 47. In such a case as this there is a very strong presumption, without direct proof, that the mental condition of *Giles* had been the same for a long time. In some cases such proof is admissible in relation to a time many years anterior to the adjudication; and four months was the time in *Dailey v. Kastell, supra*, and the same in *Smith v. Smith, supra*. The evidence in this case shows very conclusively that *Giles* was as incompetent to make the deeds when they were made as when the final order was made, and had been for a long time before; so that the question of the effect of the statute (sec. 3979, R. S.) in respect to the notice by the recording of the petition and order in such a case has no application. The question here is whether the defendants did not unduly influence *Giles* to make the deeds, knowing his condition of incompetency, and not whether they had notice of the adjudication. The records were offered not as *notice*, but as evidence of the mental condition of *Giles* when the petition was filed and the final order was made. The records were, therefore, competent proof of the mental condition of *Giles* when the petition was presented and when the

order was made, and, in connection with evidence that his condition had not changed since the deeds were executed, it was evidence of his incapacity at that time. The evidence before the courts on the inquisition consisted mostly of the examination of *Giles*, to test his memory and capacity. That examination was objected to on the ground, as we now understand from the position of the learned counsel of the appellants, that his declarations were not part of the *res gestæ*, because made after the deeds were executed. It is conceded that the evidence as a part of the record was sufficiently authenticated under the statute as the statements and declarations of *Giles* at the time of the inquisition. In *Robinson v. Hutchinson*, 26 Vt. 47, where the incapacity of the testator arose from old age, it was held that his declarations about the time and *after* his will was made were competent as tending to show the condition of his mind when he made it, and his liability to undue influence. In the able opinion of ISHAM, J., in that case, many cases are cited to show that the declarations of the person claimed to have been incompetent to make a will by reason of weakness of mind and imbecility arising from old age, made after the will was executed, were competent evidence. *McTaggart v. Thompson*, 14 Pa. St. 149; *Comstock v. Hadlyme Ecc. Society*, 8 Conn. 263; *Shailer v. Bumstead*, 99 Mass. 112; *Davis v. Davis*, 123 Mass. 590. This last case, cited on behalf of the appellants, recognizes the same rule, if the declarations were not made too long a time after execution of the will to have any bearing upon the testator's mental condition at the time. The testimony or declarations of *Giles* on the inquisition were not too late or remote to have a legitimate bearing upon his mental condition when he executed the deeds, by the general current of authorities, and were clearly admissible on the trial.

The point is made that the court ought to have found the oral agreement of the defendants to support *Giles* dur-

ing his life, and to bury him when dead, as an adequate consideration of the deeds. Without such finding, the facts are in the case for what they are worth. But it would seem that the omission of *Giles* to exact a written agreement to that effect, and security upon the lots deeded for its performance, in itself shows his incapacity to do business, or to take proper care of his property, or to protect himself from imposition. Besides, this inadequacy of price is only one ground for setting aside the deeds, and a single fact among other facts and circumstances establishing beyond all question the mental incapacity of *Giles* and the fraud and undue influence of the defendants.

The merits of the case on the testimony have been sufficiently considered. We think all the findings of the superior court are sustained by the testimony, and that the judgment is equitable and just.

*By the Court.*— The judgment of the superior court is affirmed.